Good morning, your honors. Dennis Camarano on behalf of the Appellant Federal Insurance Company. Follow the Supreme Court's decisions in Rigo-Beloit. Yeah, we can both lament about that, huh? Yes, your honor. A venue case, as well as Kirby, a limitation of liability case, these clear domestic rail losses under intermodal contracts have distinctively solved the aftertaste. Thus, I believe the starting point for an analysis of this dispute are our federal maritime statutes. There, Congress has repeatedly manifested a disdain for stipulations completely relieving ocean carriers from common law strict liability. I commend the court to the Harder Act, 46 U.S.C. Were any of these arguments you're advancing in your brief advanced in the district court, aside from the one that Rigo-Beloit has now rendered a nullity, let us say? Short answer is no, your honor. So why should we be addressing those? Because the law in the circuit at the time was, of course, your decision. When this first presented, did our opinion in Rigo-Beloit frame the pleadings in this case? It did. Came down after, did it not, after you filed your complaint? The filing the complaint, yes, the decision came down after filing the complaint. My opinion. Your opinion came. So whatever you did and put in front of the district court would not have been based on the, my opinion. I'm saying my district court circuit. It was. No, your honor. It was based on your decision. At the time you filed the case? At the time I filed the opposition to the motion for summary judgment. Before then, was there any of these other theories put forward? The Harder Act, common law, MIDA, any of those? Not when the case was filed. Not when this particular case was filed. Right. So you framed your arguments in the district court, taking advantage, understandably, of our opinion. But that does not explain why these other arguments that you had against this clause was, were not presented to the district court. Your honor, I relied on your decision. I thought that was the rule of the circuit. I admittedly placed the stock in that argument. I believe the court has discretion at this point to entertain the common law arguments that I'm raising against exemptions from liability. I believe the Union Pacific has had the opportunity to brief the issue as the court has given us briefing opportunities for that. My understanding is on, in this appeal, you're saying at least two things. One is that the Harder Act, H-A-R-T-E-R, prohibits enforcement of the covenant not to sue. Is that one of the positions you're taking? I'm saying the Harder Act is more of a baseline to demonstrate congressional disdain for that. I think, in fairness, the Harder Act, pursuant to its specific wording, identifies custodial ocean carriers. So to that extent, we're trying to bend a federal statute that was employed prior to intermodal contracting to this situation. Did the Harder Act exist at the time you argued in district court? Yes, Your Honor. And your other contention is that federal common law should prohibit enforcement of the covenant? Which also existed prior to the argument, Your Honor. And the third one is that you can bring a claim under U.P.'s separate contract with the common carrier? Yes. And wouldn't that require facts to be developed in district court? Yes, Your Honor. I believe so. In 1974, this Court considered a bill of lading purporting to immunize a non-COGSA carrier, Todd Shipyards. That is Grace Line v. Todd Shipyards. And this Court pronounced it is the holding of this Court that a contract, no matter how clear and express, which purported to wholly immunize a non-carrier from liability for its negligence, is repugnant to traditional law and to sound policy. This covenant not to sue doesn't immunize all sources of liability. It only focuses it on APL, doesn't it? That's exactly correct. So what's the problem with that? Well, the problem is that the Supreme Court in Bissell v. Inland Waterways identified the two reasons for the prohibition, and Bissell was a non-COGSA case, against exoneration, complete exoneration. I don't believe this is a restriction of remedies matter. But the reason for... I'm not following your answer. This is not complete exoneration. It's exoneration of others than the APL, but APL would be liable, would it not? It would. Okay, so... It is the complete exoneration of the custodial party, the party that a common carrier... Well, maybe APL seeks indemnity over, but... That may be. I guess... Your complaint is your client wants money for the damages, and it's got a defendant, APL, which, isn't that right? No, our client wants to lay blame at the feet of a wrongdoer to, in part, incentivize that wrongdoer, a common carrier, from damaging cargo in the future and not engaging in negligent conduct going forward. And I don't believe... That's very big of your client. I'm sorry? That's very big of your client, doing it for the public good here. But as best I can tell, it's doing it at its own cost. It's really the short-sighted position. I mean, people buy insurance to cover the fact that they can't sue the carrier. And so if you win this lawsuit, you're essentially undercutting your own client's business. I mean, why buy insurance for something if you can recover in tort, right? So you may win this case, but you may kill the business. Judge, because we recognize, or the insurance company recognizes, that there are several limitations of liability. Bill of lading limitations are certainly subject to... And you take them on one at a time. I mean, this is a commercial contract. You know, you've got somebody who ships the goods. They pay for shipment. They buy a product that does not include the ability to sue. And then they supplement by paying extra for insurance, which is why your client is. How your client builds his business is by filling in for assuming that risk, rather than having it channeled to the uncertain process of resolving the matter in court. So tort liability. What could be better than that? I mean, why is that possibly unenforceable? Well, what's better than that? I mean, you know, if you were dealing with a little old lady or something like that. But this is a commercial arrangement. It seems like a perfectly sensible way to allocate, to parcel out the services. Yes, people who specialize in shipping get paid for shipping or transport. And people who specialize in risk management get paid for... You know, they buy the risk, essentially. And, you know, it seems perfectly sensible. And if we wanted to sort of sanely arrange a system of commercial arrangements, that's one we've come up with. Transactional developments, whether the prudent decision to buy insurance, the idea of spreading risks, are certainly one consideration. And I might mention that when it comes to insurance, when one buys insurance, the insurance company in its calculation also assumes that it will generate a certain amount back in subrogation. But ignoring that, those... Well, we should disabuse it of that notion. That way it'll adjust its premiums accordingly, and it will wind up carrying the full risk, as it's paid to do. And let the carrier concentrate on what it does best, which is to carry. It seems perfectly plausible. I mean, you want to say this is somehow non-enforceable, and that sort of pushing things back into the tort system, into the litigation system, is somehow a superior solution. I mean, I don't get it. I'm not at all persuaded of that. Why don't you... Persuade you that the common law, we can't... The Supreme Court said, and maybe this will have some impact on you, that the Supreme Court said in Atlantic Mutual... Well, the Supreme Court says around here it's limited... Careful, this is on tape. I think that legislative consideration and action can best bring about a fair accommodation of the diverse but related interests of the varied groups who'd be affected by permitting carriers to deviate from the controlling rule that without congressional authority they cannot stipulate against their own negligence or that of their agents or their servants. That's very pathetic. I mean, I couldn't have said it better myself. What does it mean? It means that when you put in these hurdles to recovery by a claimant, you can do so and limit the liability of a carrier. But once you totally exonerate a carrier, you bump up against the common law. And Union Pacific, for example, in this case, can have its liability limited to the same extent as APL. But to totally eviscerate and have no recourse at all, again, bumps into the common law because of the idea of trying to incentivize a common carrier as to not damage products. Right, which brings us back to my question. I mean, you have given us this incentivizing idea that this will affect carriers, which is sort of one consideration, and maybe it works, maybe it doesn't. Incentivizing is a hard thing, and it's like pushing a string sometimes. But what I was suggesting is also a reality in the marketplace, and why is that a perfectly good counter-policy? It says, look, risk is always going to happen. You can't squeeze the risk out of any human enterprise, and you certainly can't squeeze the risk or eliminate the risk out of carrying large quantities of goods over thousands of miles across land and sea. It's an inherently risky enterprise that will be subject to the vicissitudes of reality. So given that fact, why isn't a commercial arrangement where you have the people who are in the business of allocating risk get paid to do that, and people who are in the business of transporting get paid to do their business? Why isn't that the superior arrangement, and what is it in the common law that stands in the way of that? What stands in the way is that you're using prudent decisions to buy insurance and then making that prudent decision a no-fault system. You're now converting it. You're using that prudent decision to now convert this into a no-fault situation where carriers, common carriers, UP still being a common carrier under Regal-Beloit, is now able to be completely shielded. No, they're not. That's what I don't understand. This is a commercial arrangement where APL does the master contract. It sets up the whole intermodal transport system. Isn't that correct? It is. And then what it does is it puts in its bill of lading and its contract that says, all right, and you, the shipper, you're standing in the shoes of the shipper, not the insurance company, but the shipper, you are going to have a responsible carrier party, APL, responsible. You are not going to sue my subcontractors here. If you've got a beef with the services we provide, you come after us. There's no evidence in this case they aren't a viable defendant in terms of, you know, being judgment-proof or the like. And the system of economics, as I understand it, will be that if the carrier that they retain to do their business or transact their business turns out to be a negligent or a terrible entity, they'll exact that and remove, A, they'll probably try to claim over against them and probably not hire them the next time. So your brief and your argument today talk in these terms of absolute, like exoneration and the like, and I don't see that in the record. And that's one of the reasons I have trouble with this argument being made to us ab initio on appeal, because you say it's a pure question of law. It's not clear to me it's a pure question of law. Now that we're into the miasma, perhaps, of the economics of it. That's my problem with it. I would say that a claimant to common law has a bundle of rights, and the rights are not simply against a contracting party. But when it comes to common carriage and simply because this development of taking part of a ship, out of the ship and now putting it on steel wheels, you use another carrier. Union Pacific is a common carrier. And there are special rules in common carriage that we believe and argue that should not be ignored or should not be superseded by Judge Kaczynski's thought about the market process. I just get mine from the post office. If I want to ship, let's say, a computer, you know, a piece of equipment, something, using the United States Postal Service to my friend in New York, right? I put it in a package, and if I don't buy postal insurance and the thing gets lost or dropped or, you know, the mailman decides to play soccer with the package or football, you know, whatever, I'm out of luck. If I buy insurance, I put in a claim, you know, postal insurance, you just, you know, you pay extra and it's based upon your declared value of the package. And then if it's broken or if it doesn't get there, you say, look, package arrived broken or didn't get there, and you make a claim and they pay you. This is the reality today in the United States. The same thing is true, I believe, of FedEx. And I know less about what rights you might have against FedEx, but I know for a fact that you are just plain out of luck if the post office decides to use your package for, you know, to pop up its truck or something. You're out of luck if you didn't buy insurance. Why isn't that reality, which applies to everybody in the United States who uses the United States Postal Service, why isn't that the reality, shouldn't it be applicable to commercial shippers? Why should it be against public policy somehow to apply the same regime to people who ship for commercial purposes? Because the common law found it appropriate that when parties have oligarchic power, particularly, and there is a policy that... But the common law is not frozen in place. I mean, this is the reality of shipping today in America. If you're just a consumer, if you're just a regular person and you want to ship a package from one place to another, the reality is if you want to have, to make sure that the contents of those things are not damaged or lost in shipment, you buy insurance. If you don't buy insurance, you're out of luck. Why isn't that the new common law? The common law changed for 600 years. It's been changing. Whatever old cases may say, why isn't this the reality today? Well, because not everyone still buys insurance, and having a rule for those that buy insurance versus those that don't buy insurance seems to be turning the idea of being conservative and responsible of buying insurance on its head, and because the Supreme Court insists that legislative enactment is required to change that longstanding common law that you're alluding to through the years. I hope you understand. Okay. Thank you. Thank you. We'll hear from the other side. Yes, ma'am. Good morning, Your Honors. Leslie McMurray on behalf of Apelli Union Pacific Railroad Company. I do agree with the Court, I think with what the Court has implied in its comments, that many of the arguments that were proffered in the supplemental brief could have or were not raised at the district court level I do believe that Judge Wright's opinion came out prior to this Court's opinion in legal beloit. And I think that the whole discussion of the Harder Act is completely out of line. There's no application of the Harder Act to the railroad under any contract clause. If you want to talk about the Hague Rules, the Ninth Circuit said in a complaint of Damandor Bolt Carriers that the Hague Rules is an international body of law that was adopted in COGSA, and that it is virtually identical to COGSA. And then if you go to the Starek-Mers case that the Ninth Circuit issued, which Justice Fisher was part of, that case says very clearly that there is nothing in COGSA which precludes the parties from including in their contracts any kind of agreement for the period after the lading is taken off of the ship until the time that it's delivered. So this discussion about the common law is ignoring all of the recent developments in the common law itself. It's ignoring Kirby. It's ignoring Starek-Mers. And the arguments were simply waived. And I don't see how Federal Insurance Company starts off its supplemental brief talking about issues that have nothing to do with Regal Bloit and saying, oh, this is purely legal, and then by the end of its brief says we should remand this case for factual findings relating to Union Pacific's contract. It just seems like those are inconsistent. It's an improper supplemental brief, and there's no further argument left to be made, really. I would like to apologize because in my most recent Rule 28J letter, I miscited the citation to Judge Reel's order. It should have been 2011, Lexis, and I apologize for that. But I would also like to say that insurance companies all the time shift risk within their own contracts. They say who's going to be carried, who's going to be covered, under what circumstances, and oftentimes a party finds itself very surprised if it hasn't read its insurance contract. So, you know, as the Court has, I think, amply stated, these are the commercial realities of shipping. Judge Fischer in Staragmaris correctly stated that it is commonplace to extend COGS terms inland, and when it does, under Kirby, Judge Fischer said, these contracts are fully enforceable. Thank you. Thank you.
judges: Kozinski, Hawkins, Fisher